IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Clarence Scott Miller, ) | |
| ) | Civil Action No. 6:08-4177-HFF-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Director Larry Powers, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment. In his complaint, the plaintiff, a state prisoner proceeding *pro se*, alleges that while he was a detainee at the Spartanburg County Detention Facility ("SCDF") he was falsely charged with causing a riot and put on administrative lock-up. He claims he was denied running water and hygiene items, causing a rash to spread over his body. He further claims that his requests for medical attention went unanswered.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

On July 9, 2008, the defendant filed a motion for summary judgment. By order filed July 10, 2008, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The plaintiff filed his response on August 8, 2008.

**FACTS PRESENTED**

Beginning August 3, 2006, the plaintiff was detained at the SCDF to await the disposition of pending charges consisting of burglary in the first degree and petit larceny. He was housed in Pod 3 of the SCDF (Larry Powers aff. ¶ 3, ex. A). The plaintiff is now an inmate at Kirkland Correctional Institution.

According to the affidavit of defendant Larry Powers, the Director of the SCDF, on September 22, 2007 at around 7:49 p.m., the officer in charge of Pod 3, Officer Kunak, requested that all inmates return to their cells for a rebriefing on the rules of the SCDF concerning noise control and inmate behavior. Prior to the rebriefing, Officer Kunak had requested two times for the inmates to quiet down. However, the inmates had failed to comply with this request. As they returned to their cells, numerous inmates made derogatory and threatening comments to the officer. After the inmates had returned to their cells and closed the doors, Officer Kunak checked the doors to ensure that all of the doors were secure. While the officer was in the process of securing the cell doors, the inmates began to kick the doors, demanding to be released, and cursing at the officer. Officer Kunak then stated to the inmates that he would allow them back out after they followed his request to quiet down. Some inmates continued to kick the cell doors and make disrespectful remarks. As he walked through the pod to locate the inmates instigating the disturbance, and noted the plaintiff to be one, Officer Kunak heard inmate Travis Austin advise the other inmates to start flooding their cells. Officer Kunak then observed other inmates at their cell doors yelling obscenities at him and making physical threats toward him. Worried about the safety and security of the pod and of himself, Officer Kunak contacted Lieutenant Church and advised him of the unrest in Pod 3. He also requested additional officers for assistance in locating and removing the inmates causing the disturbance. Lieutenant Church advised Officer Kunak to leave the pod locked down until order could be restored (Powers aff. ¶ 7, ex. C).

Despite numerous warnings and orders to quiet down, the inmates continued to act in a riotous manner. Officer Kunak again called Lieutenant Church to advise him that the situation in Pod 3 was disintegrating. About 20 inmates in multiple cells had flooded their toilets and sinks and kicked their doors in an attempt to incite the other inmates to riot. Lieutenant Church arranged for the water to be cut off from the pod to prevent any additional flooding. While turning off the water, Lieutenant Church heard the inmates declaring that they were going to pop their locks and assault Officer Kunak. Inside the pod, the inmates continued to disrespect Officer Kunak, to verbally assault him, and to threaten him physically. Inmates also continued beating on their cell doors. Additional assistance was needed to regain and maintain order in Pod 3, so defendant Powers instructed the officers to organize a Response Team to help Officer Kunak regain control and to allow for the safe removal of the inmates from Pod 3. The riotous actions of the inmates continued for several hours until the Response Team arrived and began to remove the inmates from the pod one cell at a time, causing no injury to inmate or officer. Inmates that were identified as not participating in the riot were escorted to the recreation yard in another housing unit. Those involved in the riot were removed to the holding cells in booking. The cells in Pod 3 were then searched and cleaned from the flooding (Powers aff. ¶ 8, ex. C).

The inmates not involved in the disturbance were returned to their cells. Inmates involved in the riot were briefed on the expected behavior of inmates and instructed that riots and demonstrations were not allowed (Powers aff. ¶ 9).

The SCDF has in place a Security and Control Policy to follow in emergency situations, such as a riot (Powers aff. ¶ 10, ex. D). Defendant Powers testified that the staff of the SCDF followed this plan on September 22, 2007, when the inmates began a disturbance in Pod 3. Defendant Powers further testified that he followed South Carolina Jail Standard #1013 to temporarily suspend standards based on the emergency situation that existed at the SCDF during the riot. In doing so, he reported this incident to the

Director of the Jail and Prisons Inspections Division of the South Carolina Department of Corrections ("SCDC") (Powers aff. ¶ 10, ex. E).

Certain activities and privileges were curtailed until order could be restored and maintained in Pod 3. Showers and changes of clothing were discontinued until order, as well as water, was restored to the pod. However, officers turned on the water intermittently to flush the toilets. Also, inmates were not allowed certain hygiene items, such as bars of soap, from September 23, 2007 until October 1, 2007. According to defendant Powers, these items could be used as weapons or to stop up the toilets in the cells (Powers aff. ¶ 11).

According to defendant Powers' testimony, during the lockdown, the pod was monitored and evaluated daily. Limited activities and privileges were restored in each cell as security concerns permitted. The SCDF took all necessary steps toward returning the facility to normal operation as soon as possible. During this time, inmates were still allowed to file written grievances to defendant Powers or the other officers at the SCDF. Medical requests were also allowed. Although other inmates availed themselves of the grievance process, the plaintiff did not submit any grievances during the lockdown (Powers aff. ¶ 12).

All cells were reopened by October 4, 2007. As a result of this disturbance, 31 inmates, including the plaintiff, were charged with inciting prisoners to riot under South Carolina Code § 24-13-430(1) (Powers aff. ¶ 13).

According to the affidavit of Nursing Supervisor Judy Collins, on October 28, 2007, over three weeks after normal activities resumed in Pod 3, the plaintiff began to complain about a rash on his body. Dr. Salvatore Bianco, the contract physician at the SCDF, reviewed his complaints and determined that no treatment was necessary. The plaintiff did not complain again until December 10, 2007. In response to his request, the plaintiff was provided with hydrocortisone cream on December 15, 2007. On December 20, 2007, the plaintiff filed an inmate grievance complaining that the hydrocortisone cream was

not working. On January 6 and 14, 2008, the plaintiff again complained to the medical staff about his rash. Dr. Bianco reviewed the requests and determined no treatment by the medical staff was necessary. On February 10, 2008, the plaintiff requested additional treatment. He was examined by a nurse who determined that the plaintiff had a fungus rash on his back and instructed the plaintiff to get fungal cream from the canteen. The medical staff received no further complaints from the plaintiff about the rash (Judy Collins aff. ¶ 5).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

5

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

***Conditions of Confinement***

The plaintiff contends that his constitutional rights were violated by the conditions of confinement during the 11-day lockdown of Pod 3. Confinement conditions of pretrial detainees are to be evaluated under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535 (1979). Where a pretrial detainee complains of prison conditions, the proper inquiry is whether the conditions of his confinement amount to punishment before a proper adjudication of guilt. *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992). Not every hardship suffered during pretrial detention amounts to "punishment" in the constitutional

6

sense. *Id.* (citing *Bell,* 441 U.S. at 53). Absent a showing of expressed intent to punish on the part of the correctional officials, the determination of whether a particular action is punitive turns on whether it was rationally connected to legitimate non-punitive governmental objectives and whether it was excessive in relation to that purpose. *Bell*, 441 U.S. at 537-40; *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). "'[I]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.'" *Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

As argued by the defendant, the evidence before this court shows that the actions taken by the SCDF were based upon security needs and the level of supervision necessary for the orderly operation of the institution. The actions taken by the SCDF were not a form of punishment but essential to maintain good order and discipline following a riot. Further, the plaintiff has failed to show any injury resulting from the alleged conditions of confinement during the lockdown. Although he complained of a rash on October 28, 2007, this was some three weeks after the end of the lockdown. He has offered no evidence to correlate the lockdown to this rash. Moreover, the injury alleged by the plaintiff is nothing more than *de minimis* and was apparently successfully treated with over-the-counter fungal cream available in the SCDF canteen. The plaintiff has failed to present evidence showing a genuine issue of material fact regarding his claim of a constitutional violation because of his conditions of confinement at the SCDF. Accordingly, summary judgment should be granted on this claim.

*Medical Care*

The plaintiff also complains that the defendant was deliberately indifferent to his medical care when he developed a skin rash during his detainment. "The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (citing *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir.1988)). The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97,102 (1976). This obligation arises from an inmate's complete dependency upon prison medical staff to provide essential medical services. *Id.* The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. Instead, it is only when prison officials have exhibited "deliberate indifference" to a prisoner's "serious medical needs" that the Eighth Amendment is offended. *Id.* at 104. As such, "an inadvertent failure to provide adequate medical care" will not comprise an Eighth Amendment breach. *Id.* at 105-106.

In order to state a claim, "[a] plaintiff must satisfy two elements . . . : he must show a serious medical need and he must prove the defendant's purposeful indifference thereto." *Sires v. Berman*, 834 F.2d 9, 12 (1st Cir. 1987). A medical need is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied,* 500 U.S. 956 (1991). "It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle*, 429 U.S. at 106. Mere negligence or malpractice does not violate the Eighth Amendment. *Id.* Moreover, disagreements between an inmate and a physician over the inmate's proper medical care do not state a

8

Section 1983 claim unless exceptional circumstances are alleged. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

The plaintiff has failed to show that the defendant was deliberately indifferent to his serious medical need. According to the affidavit of Nursing Supervisor Collins, fungal rashes are very common and, although uncomfortable, these types of rashes are rarely serious and can usually and easily be treated with over the counter creams available in the SCDF canteen (Collins aff. ¶ 6). As set forth above, the plaintiff's rash was initially treated with hydrocortisone cream and, when he continued to complain, he was told to purchase fungal cream from the canteen, after which the medical staff received no more complaints from the plaintiff about the rash (Collins aff. ¶ 5). The plaintiff has failed to show that the defendant showed deliberate indifference to a known, serious medical need by failing to consider his complaints or by acting intentionally and unreasonably to delay or deny him access to adequate medical care. The treatment of plaintiff's medical condition was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Based upon the foregoing, the plaintiff's deliberate indifference to medical care claim fails.

***Qualified Immunity***

Lastly, the defendant argues that he is entitled to qualified immunity as his conduct did not violate any clearly-established constitutional or statutory rights of which a reasonable person should have known. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was

clearly established at the time of the alleged violation so that an objectively reasonable official in the defendant's position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). The plaintiff has failed to demonstrate that the defendant violated any of his constitutional rights. The testimony of the witnesses in the evidence before this court establishes that the defendant and his staff acted in good faith throughout their dealings with the plaintiff (Powers aff. ¶15; Collins aff. ¶ 7). Therefore, the defendant is entitled to qualified immunity.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 24) be granted.

                                      s/William M. Catoe
                                      United States Magistrate Judge

January 13, 2009
Greenville, South Carolina